May it please the Court, I'm Scott Watson, I'm here today on behalf of the FDIC, both in its corporate capacity and as the receiver for the failed Great American Bank. With me today is Mr. Dick Roy, our counsel in the trial court below, and I've reserved three minutes for rebuttal. Counsel? Yes, Your Honor. Let me tell you about a problem I have so you can educate me on it. I litigated a few of these dishonesty bond cases on one side and another when I was in practice, and the order of events was always different. The order of events was always first there's dishonesty, then there's loss, and then there's discovery, a typical case in embezzler. The embezzler is dishonest, the company loses money because the embezzler steals it, then the company discovers it and calls the insurance company, and the date that the company discovers it is a critical date. Here what you've got is dishonesty, discovery, loss, instead of dishonesty, loss, discovery. You've got a crook in the bank who takes bribes to make crooked deals, but the bank doesn't lose any money when the crook makes a bad loan. The bank doesn't lose money until the loan goes into default, the loan isn't paid back. Can you have, I think this policy says discovery of the loss, and I'm wondering if discovery of the crook even matters. Discovery under the policy and under this court's decision in California Union are met here, and that isn't a problem that the enormity of the loss is later discovered. I don't mean just the enormity of the loss. If you think the embezzler stole $500 from you, and it turns out the embezzler stole $500,000 from you, the date you discover the embezzler stole $500 controls. But what if Diane Lowe, I think her name was, took a bribe in exchange for loaning the bank's money to, I can't remember their name, to Mr. Childers, and the bank discovers that she took the bribe. Still, there has been no loss. It's not a matter of the extent of the loss. There's been no loss. The fact that she took a bribe doesn't mean the loan's not going to be paid back. It's not until the loan isn't paid back that the bank takes a loss. Well, luckily in this case, Your Honor, we're not confronted with that, because we did have the losses during the discovery period, and they were known. They were two, as I understand it. It would help me to walk through. Well, two, you're relying on two. One is that there were written down loans, and the other is the thing that I absolutely do not understand about the 110 percent and the 110 percent. 110 net proceeds versus net proceeds. Right, net proceeds. On that, I understood it, and I don't see that it's a loss at all. Bankers do it all the time. They've got a debtor, a developer, who's kind of light on cash. So instead of taking all the money up front until the loan is paid off, they stretch it out so that the developer won't fail, because if the developer fails, then you can't draw blood from a stone. The bank gets nothing. That would be the case if that were the deal that the bank structured, but the bank structured the deal for net proceeds where all the money went to the bank. It would help me to understand it. I understood it to be the opposite, that the problem, that the 110 percent, which was what was well allowed, had them paying faster, not slower. It did not have that effect, Your Honor. Indeed, some of the money went back to children that otherwise would have been used to repay loans to the Great American Bank. Oh, one of us misunderstands it. I thought the deal was the bank had a net deal, which means if Childers borrows $1 million to build 10 houses for $100,000, and they're going to be $100,000 each when they sell, then the bank – well, I got the numbers wrong, but basically the bank gets the money from the first sale, all of it. The bank gets the money from the second sale, all of it. And Childers doesn't get any money from selling houses until the bank loan is all paid back. Correct, Your Honor. The 110 percent, as I understand it, is changed from net. It means that all that the bank gets when the first house is sold is the pro rata share of the loan plus 10 percent. That's correct, with the balance going to Childers, which is the amount that Childers received. Childers gets to keep some cash out of the sale of the first house, even though he still owes the bank some money. Correct. And the second loss, to address your earlier question, the second loss is the writing down of those loans, which Mr. Andrews, the senior financial officer, had identified as being actual losses. That's the summary judgment that the district court had. I thought all writing down a loan meant was that I make the judgment that I'm probably not going to get paid back. Kind of like in my law office, I make the judgment I think this client is going to stiff me. Then every now and then the client pays. Respectfully, Your Honor, I think there are two things. That, I believe, draws an inference that should be left to the jury to find, that a reasonable juror could find that in the real world the writing down of specific loans did find that they had recognized loss. But we get a step beyond that. Andrews recognized that there was actual loss and described them as substantial losses and recognized those losses during the period. But he didn't recognize them and he was in love. Pardon me, Your Honor? He did not recognize it as having anything to do with flow. He didn't have to. If a reasonable juror with all of the information, that's what California Union says with this objective standard. If a reasonable juror, having all of the information that the bank had, would have concluded that a loss of the type described had occurred, that's sufficient to meet the discovery test under California Union. Let me understand that. Doesn't, wouldn't the jury have to conclude that the bank both knew of the dishonesty and knew that there was a loss that was connected to the dishonesty, not some other loss? What the actual language of the bond says is that they have to become aware of facts which would cause a reasonable person to assume that a loss of a type, a type, covered by the bond has or will be incurred, even though the exact amount of the details of loss are not then known. Right, but a loss of a type covered by the loan is a loss that is caused by the dishonesty of the employee and not by something else. But the bank was also aware of conflict of interest on the part of Diane Lowe with the particular loan. I understand that, but what the jury would have to be able to do would be to connect the writing down as a loan, even if we thought that was a loss, to, or believe that the bank should have connected it or did connect it to the conflict of interest. I don't believe that's correct, John. I think the objective standard that's described in the California Union does not require that the bank's personnel, that's why it's an objective standard, doesn't require that the bank personnel, the single person there with the information, link all of those pieces together. Rather, the question is whether a reasonable juror, knowing all of those specific facts known to the bank, would conclude that a loss of the type under the bond had occurred, even if they don't know the amount. Why isn't the bank entitled as a matter of law to say we didn't discover the loss when they had this retired FBI agent investigate and he sent back a report that basically said that although there was conflict of interest, that there was no corruption or dishonesty that produced the loss? The bank did have the information necessary, Your Honor. The summary judgment evidence shows that they knew of dishonesty on their part. They knew of insider- They knew of conflict of interest. Which are illegal. That's a different thing, though, from dishonesty. I mean, there are a lot of banks that have people on their boards of directors that also get loans from the banks. Small town banks, it's pretty much impossible to avoid. People on the board of directors get loans from the bank, so there's a conflict of interest. Respectfully, Your Honor, the violation of the conflict of interest policy of Great American Bank does constitute dishonesty under the bond. So the violation of that policy. Of course, in this case, we've got a more substantial breach, which was the change of the terms of the contract to Childers to allow Childers to retain some of that money and also the BKI loans here. But the violation of the conflict of interest policy, and we've cited cases- In terms of the change of the contract to Childers, why is that a loss if he ends up paying it all back eventually? In other words, this goes back to Judge Kleinfeld's original question, I guess. Until he doesn't pay it back, why is it a loss? Well, I believe in this case, ultimately, it was not. I understand that. But in terms of what was discovered or discoverable during a relevant period is that there was a change in the contract. But was it discovered or discoverable that the bank was going to lose money over this? I don't know. Benefit. Although I'm still not sure I understand it, but I'm accepting the fact that everybody else seems to believe it was to his benefit and to the bank's detriment. But assuming that, why is it a loss? We have to look at the aggregate evidence that a reasonable juror is looking at that was known to the bank. The tie to the loss, ultimately, there was a loss here. But the bank, a reasonable juror looking at all the evidence that the bank had would conclude dishonesty on the part of Ms. Lowe, insider bailing, and actual and substantive losses. Why is it more a loss than when a bank rolls over a loan? I mean, you know the old joke, if I owe you $100, it's my problem. If I owe you a million dollars, it's your problem. The way you solve that problem is when I can't pay you the million dollars on time, you roll over my loan. Banks do that all the time. And they sure don't treat it as a loss on their books. They just treat it as a prudent management decision. But the question that's presented under California Union isn't whether they're treating it as a loss on their books. It's rather whether an objective juror could conclude that a loss of the type covered on the bond had occurred. Now, this is what's confusing me, and then I'd like to move on to the subrogation issue. Your Honor? The way you're presenting the California Union standard, it seems to be entirely retrospective. In other words, it's not, as I understand it, it's an objective standard that one looked at from the point of view of the information available to maybe an omniscient bank officer at the time, not later. And so the fact that the jury could know that later there was a loss is not going to be relevant to anything, right? What the juror does know later is the only part that's relevant, because that's what relates to the bond language which creates the objective standard. I think you're right, because it has to be whether there was a discovery of a loss or whether an objective reasonable person would have regarded it as a discovery of a loss at the relevant time. And that is based on the information available at that time, not available later. But what was available at the time during the bond period? I don't disagree with you about that, first of all. I don't disagree with you that the information had to be available during the bond period. Right. So, therefore, if what was available was that there was a change in the contract, which Childers wanted because it gave him more cash, how does that connect up just by itself, if nothing else ever happened, to the fact that there was a loss? Because there were losses of the type involved under the bond to BKI that were identified by Andrews. There were insider transactions or personal business dealings with Ms. Lowe and BKI as well. That's getting off this particular question. The particular question that I think you're asking is, is there a link between Ms. Lowe's transaction, the net proceeds back to Childers, and the loss at that time? I don't think that that's what's required to be shown under the language of the bond to discover dishonesty. I can't understand how that can't be the question. What other questions would there be? If a reasonable juror knows that a loss of the type of the loss of the type covered under the bond is going on. Later. Later. It happened later. I mean, it was only apparent later that there was actual money out of pocket to the bank. On that loss. But there were losses to BKI that had been identified as substantial and actually already occurring. All right. So, that just washes out that contract change and says that we either have a loss based on what Andrews knew or we don't. But the contract change becomes irrelevant. The BKI losses and the contract change to Childers are not the same transactions. But a reasonable juror looking at the body of what should have been sitting in the President's head may have been present. But what the bank's senior officials knew is that she was dishonest. She'd been dishonest with Moose Miller. She'd been dishonest in transactions. And that substantial and actual losses were occurring. And dishonest. Yes, Your Honor. Let me move you to another issue before we run out of time. We can come back to this. And that's the prejudice to separation rights. Once a loss is discovered, the insured is supposed to tell the insurer. And the insurer owns the separation rights. The idea is if somebody stole money and there's going to be recovery on a dishonesty bond, the insurance company pays the victim of the crime and then tries to squeeze the money out of the crook. Here, it looks to me as though as a matter of law because it's unarguable. There's no way a jury could reach a different conclusion. The FDIC gave away the Red Hawk land, many millions of dollars worth of assets, thereby very severely prejudicing the subrogation rights of the insurance companies. That's aside from all of the other issues on prejudice to subrogation rights. With all due respect, Your Honor, that is just not what's reflected in the record. Okay, explain it. That's the way it looked to me, but it's a very complex case and I could have misunderstood. I think a picture has tried to be presented of there being some type of picture. Because I got that picture, and if it's wrong, educate me. It's wrong, Your Honor. There was no big $45 or $50 million Red Hawk property that the FDIC somehow sold for $10,000. You're saying there's no prejudice, but that you're – are you saying prejudice is a requirement or not? I'm saying both. A showing of prejudice on the part of the insurers is a requirement under California law. But I must address the picture that you paint. A public auction was held with people coming in and doing due diligence on property, the remainder property in the Red Hawk development program. It was the only remainder property that had gone to Great American Bank and it was held by RTC. It was held at public auction where people came in and did due diligence, and the very purchaser himself testified, and we've got that in the record in our briefs, but the purchaser himself saw the property as being underwater and saw the property as essentially being kind of a foolhardy proposition. Nevertheless, made the purchase. Again, I'd submit a public auction where people – competitors could come in and bid. This property wasn't worth what it later became through both the development by the person who later developed it, by that person going through to the mortgages. I thought what happened on Red Hawk property was first the FDIC negotiated a deal with the crook where basically they gave him a break and he got to keep part of the Red Hawk property, and then the rest was sold off at this auction with, I think, one bidder for a nominal sum. It's our contention that a bad guy in the bank inserted provisions that released the Red Hawk golf course and other things to a partner. Okay, let's say a crook at the bank did it. I didn't remember – I might not have remembered correctly who did it, but still if a crook at the bank released the subrogation rights of the insurance company, there's still prejudice to the subrogation rights of the insurance company. Respectfully, Your Honor, there aren't, and I think if we analyze California law, beginning with the Campbell case creates the general framework that there's got to be a showing of prejudice on the part of the insurer that there's a violation of the condition. Under Alt Filich, sometimes that's obvious. But Alt Filich doesn't address subrogation rights, and there are a number of bases for distinguishing it. The case that directly addresses it is the Graydon case. Graydon Murphy directly addresses an insurance company's argument that the prior settlement – Alt Filich seems to be a case in which there was on its face – they never had to get to the prejudice question because the whole entire thing was given away and given away in bad faith, essentially. So, they never had to get to a prejudice question. So, I don't really read it as making a prejudice decision because there was no reason to. But Graydon seems to be the same thing in the opposite direction. Because in Graydon, as I understand it, what they got was a judgment for 100%, so there was just no prejudice. And where's the middle case? The one that discusses the question of whether there – AIDS, does there have to be prejudice, and what is prejudice? To quickly answer that, I would disagree with Your Honor respectfully that there's necessarily 100% recovery. The direct issue that Graydon Murphy looked at was the argument of the insurer that settling the incident prior to the insurer's proceeding. They got a judgment for 100%, so what was the problem? They transferred a claim into a judgment. And that was what the court said. So, it was essentially a determination that there just couldn't have been any prejudice. Well, the recent case that was submitted as a 28-J letter reaffirms that there – the general Campbell presumption is that the insurer does have to show the prejudice. In that case, the failure to examine was prejudice as a matter of law. But Graydon Murphy makes it clear that it isn't as a matter of law that you find prejudice, and indeed the subrogation rights that exist – and I can explain if I quickly can the policies underlying this, and they're reflected in that Lustig case. The subrogation rights that are created in Section 7 of this bond, they allow the insured to collect the amounts beyond insurance, then to the extent payment has been made, which is what happened in Alt Village, payment was made, that would give rise to subrogation rights, but to the extent payment is made, subrogation rights might then exist. If you have the cases you might have here with Red Hawk, with significant losses, let's say they're $45 million with a $30 million limit on insurance, the FDIC was entitled to go seek recovery of its uninsured amounts before the subrogation rights arose. Isn't Graydon Murphy – I mean, Graydon Murphy also relies on the fact that the insurance company was notified of the loss and kept informed of the proceedings, and whether to them at any point the insurance company felt that its subrogation rights were possibly being prejudiced or frustrated, they could have stepped in. Your Honor, I don't think the Graydon Murphy case supports that. I think the chronology suggests that the insurer had already entered into the settlement, had already gone to court to move to get a consent decree to have transferred property. After they'd gone into court, while they were waiting for the consent judgment to be entered, they did inform the insurance company, but the insurance company took no steps, and that court in Graydon Murphy doesn't rely in any way on the knowledge of the insurer, rather relies on the requirement, which is again reflected in the discussion of Campbell in this Brazil case that was submitted in 2008-J. There are circumstances where you'll have a breach and prejudice does not occur, and you've got to have an examination of whether it has. The defendant didn't even argue that the land was sold at less than full value or that any additional assets could have been obtained. Because, Your Honor, they made the same argument that the insurers make here, or that the district court relied on, that there is a per se finding of prejudice. All we're arguing is that that's a matter for the jury to consider at trial, whether the insurance company was indeed prejudiced by these actions. That should be for the insurance company to determine, rather than this court imposing a per se rule that was rejected in Graydon Murphy. I don't need a per se rule if there's no genuine issue of fact. But we contend that... And the burden can be on the insurance company, but if there's no genuine issue of fact and it's clear that they were prejudiced, you don't need a jury to say that they were prejudiced. And if the district court had made that determination, this court would be examining summary judgment on the basis of the competing evidence presented by the parties. That wasn't the determination made by the district court. But summary judgment, now, was the – was there – did the summary judgment somehow limit the issue so that the prejudice – the actual prejudice wasn't presented with regard to the facts? That was not my understanding. The district court did not reach any issue... I know the district court did not reach it. What I'm asking is why we couldn't reach it on this record. We would argue that the evidence – that there's sufficient evidence to get to a jury with the public sale of this land that was underwater and that didn't have value. Wasn't there also another settlement that we're talking about here? Yes, there was a settlement with Mr. Childers who was about to declare bankruptcy, and the RTC obtained a significant amount of money from him. And, again, we would submit that a jury would find in this case, but certainly is entitled to examine the question whether it caused prejudice to the insurance company. Let me see if I can walk through where we are conceptually or what we're interpreting when we're asking the prejudice question. My understanding is this, that in Allsville-ish, the so-called cooperation clause didn't apply because the giving away of the subrogation rights occurred before loss or discovery of loss. But here, it was after – if it occurred, it was after loss or discovery of loss. And there's a sentence that specifically says that the insurer does not compromise the subrogation rights after discovery of loss, which is, I guess, part of the cooperation clause. Is that right so far? No, I believe the portion that was wrong is the subrogation rights arise under Section 7 of the bond after payment. That's when the subrogation rights arise. I understand that, but there's also a sentence that says that after discovery of loss, you're not to give away the compromised prejudices to subrogation rights. Right. Prejudice. That's correct, Your Honor. And we rely on that language as being... So, are we therefore not, just in terms of what theory we're operating on at this juncture, the Allsville-ish theory of an implied good faith obligation from the subrogation clause itself is really not an issue here because that was only an issue in Allsville-ish because the precise language didn't apply. But here, the precise language does apply, and the question is, what does it mean? Correct, Your Honor. And so, the real question is, what's prejudice? We know, therefore, that because we're applying that language, that there does have to be prejudice. The question is, what's prejudice? Does prejudice mean I have a right to participate in this litigation as a subrogee, and therefore, you prejudice me by not letting me do that, whether there's a money loss or not, or does it have to be a money loss? Graydon Murphy shows that it does not automatically result in forfeiture. In Graydon Murphy, the settlement was entered to before there was any notice to the insurance companies. They were not allowed to participate in entering into that agreement with the wrongdoer. So, you're saying that Graydon shows... Graydon was interpreting the cooperation clause... Yes, it was. ...a good faith implied obligation. That's correct, Your Honor. And nothing in Graydon suggests, notwithstanding what the district court found, nothing in Graydon suggests that the court was relying on the prior knowledge of the insurance company that the settlement had been entered into. Thank you. Thank you. Counsel? May it please the Court. My name is Susan Sullivan, and I'm here today representing Fidelity and Deposit Company of Maryland. We were the primary insurer for the first bond period. There are also other counsel for the insurers here and ready to address this Court this morning. In particular, Mr. Valeriano, on behalf of Travelers, will be specifically addressing the discovery issue. Mr. Reynolds, on behalf of National Union, is here to discuss the Cross-Appeal. And Mr. Morris, on behalf of Underwriters, is also here to specify their involvement in the appeal. Have you made some kind of deal about how much time each person gets? We haven't made a specific deal. We would... I don't... I'm just asking it because I want to know if I should tell the clerk to limit your time. Certainly. If I go over eight minutes, let me know, because I certainly don't want to take the other folks' time. Could you set her clock for eight minutes? Thank you. Although this appeal involves two distinct legal issues, and you touched on them already, the discovery and the segregation, there is a common theme to both of them in this particular case. And I believe this theme informed the district court's opinion below. And that issue is one of timing. I think this goes back to what Judge Kleinfeld opened our argument with, which is the thought that somehow things didn't happen in order here. These are financial institution bonds. They are a separate type of insurance than what we are typically used to seeing. They are not triggered by an occurrence, which, for example, in an environmental pollution case, if you were on the risk 20 years ago and that pollution was ongoing for 25 years, you're stuck. That's not what triggers the policy, too. This is not also a claims-made policy, where if you get sued tomorrow, whoever your insurer is tomorrow is stuck on the risk. This is a discovery-based policy, as Judge Kleinfeld pointed out. It says, this bond applies to losses discovered by the insured during the bond period. That's the trigger of coverage here, and that is one of the things that links both of the aspects in this case. One, discovery. When did the bank discover what happened? And Mr. Guariano is going to discuss that. But number two, the subrogation provision is keyed off when the loss was discovered by the bank. And what is so unusual here is that the bank- Well, the subrogation clause isn't. The cooperation clause is, right? I don't consider it a-I don't believe it's a cooperation clause, and I don't believe it's- But if one calls it, it's the sentence that says that they- Again, there's this other sentence. There's this other sentence that says you have to cooperate with us in providing the subrogation-providing us the ability to enforce our subrogation rights, and in particular, you shall do nothing after discovery of loss to prejudice those rights. Okay. Now, just so I'm clear, because I asked this on the other side. So we're not operating here, because I don't think we should be or could be, on the Altschulish implied good faith from the subrogation clause theory. We're operating on this clause. That's correct, because there's no need to imply a duty of good faith. This was not terribly clear in the briefs, but the-so the clause itself talks about prejudice, right? It does. So the question is-so really, the very narrow question here is what's prejudice? Is that accurate? I think that's accurate, Your Honor. And whether it can be strictly technical, i.e., as-to take the Graydon example. In Graydon, the employer-the insurance company did not have the opportunity to participate in the settlement. So to that degree, they were, quote, prejudiced, because they should have had that right. I actually don't agree with that, Your Honor. Because? Because the Graydon case, which is all of three or four pages, it doesn't indicate a settlement was made before the insurer was involved. What it indicates is that on November 13 of 1964, Dixie Mason quit her job that day and confessed to spilling 30 grand and offered to pay it back. The employer, the Oldsmobile employer, didn't release anything. They didn't release any rights that the insurer might have had in subrogation. They said, oh, well, yes, you're going to pay us money. We'll take it. That agreement was never formalized. She left town the next day, and they sued her a week later, and they told their insurer a week or two after that. Very little had happened. There was really nothing else the Oldsmobile dealer could have done. She confessed and said, I'll give you 80 acres, and I'll pay you 400 bucks a month. And then she left town. She called it out directly to the insurer and said, here, you deal with it. And instead they filed a lawsuit. So to the degree there's some abstract interest of the insurer in filing their own lawsuit instead of having other people file their lawsuits, this is what I was trying to say, then that did happen there and before there was notification. But there was clearly no monetary loss. There was no impairment of subrogation rights. I fail to see what the insurer could have done differently in that case. They were informed within a few days. I suppose in this instance when they sold the property, they did everything they did exactly the way they did it. But when they sold the property at auction, they got $40 million. Would you have a chance? Yes, because I think what we're talking about is two different things. The provision says you shall do nothing to prejudice subrogation rights. What the FDIC is saying is we can actually prejudice those rights and in this case completely destroy them because we had no rights to subrogation by the time we were notified of the claim. What they're saying is you actually have to show another type of prejudice on top of that, a type of prejudice that the Camel Corp. So your position is even if they got every penny they could have possibly gotten, you would still be able to not pay any insurance that was sent to them? Absolutely. I thought your argument was not so extreme. I thought your argument was that it's apparent that they prejudice the subrogation rights by giving away the security so cheaply rather than even if they had done the best that could be done, we'd still be home free. Well, it certainly is our argument that they did not. You're saying now even if they did as well as we did in realizing recoveries that could be applied against the bond, still there's no obligation for the insurance companies to show prejudice so it doesn't matter. Is that what you're saying? I understand it. You're saying that prejudice is the frustration or the risk of the subrogation rights. The way I'm looking at it, maybe it's sort of a third way of looking at it, is that, yes, they prejudice your subrogation right perhaps, but there's no damages because there's no difference in what you could have gotten by selling the property than what they could have gotten. In the district court we had actually two different arguments in the summary judgment motion. One of the arguments was they impaired subrogation rights, therefore, as a matter of law, they breached the contract and we are released from any obligation payment. The reason I think, and I could be wrong about this, why this matters without regard to any damages question is because what you're claiming is the authority to simply walk away from the agreement. And I think that's why it does matter. I mean, that's why it's a question whether it's damages or contract interpretation. Well, we also argued in the same brief, Your Honor, that, in fact, they did prejudice us. Did you have some evidence there, some deposition of an appraiser or an affidavit or something, saying that if we had had control of this, we could have gotten a lot more money out of these people and we could have gotten more money out of the land? We didn't have that exact evidence, Your Honor, but we had significant amounts of evidence. For example, the purchaser of the remainder portion of Red Hawk testified that, yes, he got the property for $10,200 and he stood to make $50 million on it. But that was here a slider. That's not the point. The point is, had the insurance companies received proper notice, ordinarily what there is is notice and tender so that the insurance company can protect its subrogation rights. They didn't get notice. They didn't get tender. And what I'm looking for as the next step is for the insurance company to say, we could have done a lot better than was done for us if we'd gotten notice and tender. Like an MAI appraiser's affidavit says, on a private sale, we could have gotten anywhere between $10,000 and $50 million for the property. The fact that the guy that got it for $10 developed it and got $50, I guess supports an inference that more could have been gotten, but there are several steps of inferring you have to do. Well, yes, Your Honor, and in preparing for the underlying trial, we had obtained all that sort of evidence. When they talk about a public option ---- I want to know what there is. This case is coming to us on summary judgment, right? Correct. So I want to know what there is to establish a genuine issue of fact on or to preclude a genuine issue of fact on whether you were prejudiced. With regard to the Red House transaction, obviously there are two sets of transactions. Are you? With regard to the Childress transaction, is your position there as well that on this record there was prejudice? Or is it something that you don't have to prove it? Prejudice meaning money prejudice. I understand we have a ---- There's two different types of prejudice. I understand. I'm talking about money now. And obviously the district court found that we didn't have to second guess what they did since they didn't tell us what they did until long after. What case is wrong? Tell us about the money. Okay. Well, on the Childress, there are two different aspects. One, there's the settlement that they entered into with him about a year after our bond expired, by which they released him from all of his personal guarantees. They released his wife from all of his personal guarantees, and he testified in his deposition that he had considerable wealth beyond what they released him for. So there's that aspect. There's also the aspect that there is one property that he turned back over to the bank, and that was the Otay Mesa property that was addressed in our underlying brief. That particular property, I believe, was part of these public auctions where not one piece of property is being auctioned off, but dozens. And we are talking, there's no public that can buy these portfolios of property. We're talking about a very limited amount of people who had money or access to credit following the SNL crisis. So there's a whole issue about this public auction process and whether that's a process that the insurers would have permitted any of the properties he didn't go to buy. That's my question on the Red Hawk property, was that the insurance company might have had the luxury not to participate in the or choose not to participate in a public auction process at all. But what the insured, what the FDIC did, was deprive you of the choice to hold the property and wait until values went up. Correct. And wait until there was someone who had, you know, the wherewithal to purchase. I'm familiar with some of these properties, just having read about them in the paper. But they did go up in value. There's no question about that. Whereas the FDIC might not have had the luxury to sit and wait until they went up in value. You could have. That's correct, Your Honor. And that in itself is prejudice. Have you briefed so far the question of whether on this record there is an issue of fact with regard to any of these questions we've been discussing now? In other words, my understanding is that so far we've simply, your argument has been in support of the district court's position that none of this matters. Well, I think the district court was correct in that regard. And I'm asking you, if we were uncomfortable with that, have we had briefing on the state of the record at this point with regard to any actual prejudice, including Judge Warhol's actual prejudice, i.e. that you could have kept it longer? Not at the appellate level, Your Honor. The issue of prejudice in connection with the late notice argument we were making was briefed to the child court, however. But not to this court. You're at 12 and a half minutes. I wonder if we should give your colleagues a chance. Thank you very much. Good morning, Your Honor. This is Gary Velouriani, appearing for Chappellers. I'm going to take whatever's left. I'm here to discuss discovery. And the discovery issue was the subject of the Gulf case, which we cited in our brief. And if I could just read to you a portion of that. It says, discovery takes place when the insurer gains sufficient knowledge, greater than mere suspicion, which would justify a reasonable and prudent person to believe that an act of dishonesty and loss within policy coverage had taken place. Do those have to be connected to each other? They do. Because what the Gulf case also says, Your Honor, is that discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and appreciates the significance of those facts. So if you have a dumb insured who doesn't realize that they have this woman who's, you know, they just got a letter of complaint and they have this FBI investigator who maybe doesn't do as thorough a job as he could do and there's no other red alerts going up, or alternatively, it's not just that they're dumb, but perhaps the insured is, like, purposely looking the other way because they just had gotten rid of another dishonest employee and had replaced him with her, that gets you off the hook? No, I don't think so, because what we're talking about really is a reasonable man's standard. It is an objective standard to some degree, because you have to look at the facts as they were known at the time. What the FDIC wants to do, though, is read out what the reasonable people here viewed it as at that time. That's a good question. All right, you have these written down loans. You have a woman, you have an anonymous letter saying this person's a crook. You have, which some of her written down loans were loans that she had been involved in, as I understand it. Then you have an investigation which concludes that she, in fact, was operating in conflict of interest on several occasions, not just once. And, moreover, had lied to the investigators about the last sale. The question is not whether, you know, the actual bank officers who may have been either, as Judge Warthog says, either stupid or had some motivation to not inquire further, didn't realize there was a connection between all this. But, as I understand it, it's whether a reasonable person would have realized there was a connection between all this. Is that right? That's correct. That's correct. Why wouldn't a reasonable person have said to themselves, here we have somebody making, you know, very serious accusations. We've had a very short time to investigate it. But even in the very short time to investigate it, we found out that this person was, in fact, dealing in customers' property, which she's not supposed to do, and, moreover, lied to us about it. And we also know that there is some problem, some shakiness about some of the loans, or possible shakiness about some of the loans that she had given, plus this change in one of the contracts. They knew all that. Why wouldn't they draw the inference there's something going on here? Well, let me address that one at a time. First of all, we have an anonymous letter. Nobody came forward. Now, the anonymous letter was, you know, it had several bits of information, and none of which proved true, i.e., that she was taking kickbacks and bribes. Oh, it did ultimately prove true. It did prove true. Ultimately, yeah, many years later. But not that. Also, it was an insider's letter. We don't know that. We don't know that it was an insider's letter. It was the most reasonable inference from the abbreviations in it, and I think it was the envelope, too. Frankly, I don't agree with that, Your Honor. I think that – but I have my own personal views on that. One of the bad guys in this case was Mr. Moss, who wasn't even mentioned in that letter, and all the evidence indicates that his loans were probably one of the worst at the bank. Oh, you think it's the one court trial? It could have been. It could have been. There's some other courts. But to address the court's issue, I don't agree that this was a conflict of interest. I believe this was a potential conflict of interest because even the CEO, when he wrote his letter to her at the end, said, you may have violated. Remember, there was no policy against buying properties from borrowers of the bank. I mean, this bank was huge. Most of the properties that were being sold in San Diego would have come through that bank. What the policy was is you had to disclose it. She didn't disclose it, frankly. She did not disclose it. However, the investigation did reveal that there was no purchase of properties under fair market value. She paid whatever anyone else would have paid for those properties. Ergo, no detriment to the bank. And that was what the reasonable people there were looking at. Moose Miller, the security officer, the loan, I'm sorry, the auditor who was in on the investigation, the lawyer who was in on the investigation, and ultimately the president and CEO of the bank, Mr. Kemper, all looked at it and all testified, and we provided that testimony, that they did not believe that the assets... Specifically, whether she'd had any other sales, bought any other properties. She had bought some other properties the day before, and she didn't tell them of that. Again, we can characterize that as a lie. What she did do... No, what she did, no, what she did, she did disclose it, true. But what she did do before the end of the investigation, she did disclose it. So, it wasn't something that they found out and later caught her on. She did disclose it before the end of the investigation, and that's laid out in Mr. Miller's letter, or his memo, wherein he recounts all of this. So, if we're looking at all of this, and also we're looking at the shakiness of some of the loans, you have to recall what the state of the real estate market was in San Diego at the time. Let me make something clear that Mr. Watson pointed out. None of the loans that the FDIC has made claim for were lost at this time. They may have been classified, but none of them were the loss. There may have been other loans by the same lenders that may have qualified as losses, but she was not exclusive. She was not the only loan officer at this institution. So, what I'm saying here is that in order to determine what reasonable people would believe... These events took place 15 years ago. I mean, we could have endless terms like... There was a discovery of dishonesty, but there wasn't discovery of a loss yet, because there wasn't a loss yet. I'm not sure that... No, I don't believe there was discovery of dishonesty. As I've said, I don't believe that the discovery of her purchasing property at fair market value, which is a violation of an internal policy, a conflict of interest policy, constitutes dishonesty in and of itself. I believe that there needs to be something more than that, and that more has to tie that into a loss. And that loss would be through bribes, kickbacks, etc. Those kinds of things which were found out only many, many years later after the FDIC went through this institution with a fine-tooth comb. There were... They didn't investigate whether there was a loss at this time. They just investigated the dishonesty part. Well, they investigated the allegations which would lead one to assume that there would be a loss. For example, if she were receiving bribes or kickbacks from a borrower, certainly one would assume, or one would look into those loans to make certain that there weren't accommodations made. They gave her a clean bill of health in that regard. They said, no, we found no evidence of bribes or kickbacks. She was retained in her job for over a year, even after the government stepped in to take over this institution. Well, but let's look again at the reasonable nature... In fact, if we look at what reasonable people believe, and there's got to be some sort of awareness. I mean, discovery, while it is an objective standard, it can't go on forever. You can't... The whole point of a discovery policy is what does the bank know, what does the insured know at the end of this policy? Because what we want to do is we want to make clear that our risks are done at this point. It helps us know what our risks are, and it also helps the insured with premiums. So, we need to know what you, the bank, as a reasonable person, believed your losses were at this time. Were you aware of significant facts which would lead you to conclude that there was a loss? The bank, if we look back, there's no evidence. And this is what Judge Whalen looked at. There was no contrary evidence presented that the gentlemen who were there at the bank and who did the investigation were at all unreasonable or were acting in bad faith. All of the evidence presented showed that the people who were there believed that while she may have been in violation of an internal conflict of interest policy, there was no dishonesty which could be connected to a loss. Significantly, that there was no diminution in the assets of the bank, no impairment in the assets of the bank. And that is what those people there believed, and they acted consistent with that. In the next bond period, when they gave the application, they indicated that they had not lost anything. And this was true until 1997. These facts all happened in 1990, and it wasn't until 1997 that we get a different set of eyes who come in with the benefit of hindsight and say, oh, wait a minute. No, this was discovered back in 1990, and whatever reasonable people would have been there at the time must have been wrong. We're going to let a jury decide this, because that's the only fair way to do this. It doesn't make sense. That's essentially reading the discovery clause out of the policy. It's like saying, okay, well, we've got a discovery clause, but we don't really care what you knew at the time. Even though you were reasonable and you have no reason to lie or hide things, we're going to look at what we know now, 10 years later, and we're going to say, gosh, looking back at that, we think you did know. I thought you were saying that the bank did not discover any loss in 1990 and could not have, no matter how searching, because there was no loss in 1990. Well, that's absolutely true as well. There was no loss in 1990. It turned out that there was dishonesty, and you're saying the bank didn't discover that either. I don't believe so. Not under the bond. Well, it seems like you don't even have to get to that. I'm thinking, if the question was, was the bank acting as a reasonable man and not discovering the dishonesty in 1990, I'd want to have a bunch of depositions exploring the relationships between Diane Lowe and the people that might have been in a position to fire her. Trust me, we had that. And those people said, no, we looked at this. The bank is going through some bad times. They did. And Ron Wade, who was her supervisor, had been the victim of a previous anonymous letter. And he was gone, and now she's there. And Robert Kemper, who was the president and CEO. Why isn't that some reason they might have believed it? I didn't know there was an earlier anonymous letter, but there was an earlier anonymous letter, and it turned out to be correct. Maybe they should have put a little more credence in this. Maybe a reasonable person would have put more credence in this anonymous letter. Well, the earlier anonymous letter proved not to be true at all. Mr. Wade was never indicted. Nothing ever happened to Mr. Wade. He retired, and that was a different situation. But I think I've gone over my time, unless you have any other questions. Thank you. We're way over time, but I don't want you to not be heard. Just take a minute. Thank you. David Reynolds on behalf of the National Union. I'll be brief. First, structurally, when do we get to your issue? Do we get to your issue only if we reverse on the discovery question? That's correct, Jim. So hopefully what I say in the next minute doesn't make any difference. If we say the district court was wrong on discovery, but it was right on prejudice, then we reach National Union. Is that right? I think that's correct, Your Honor. Well, in permanent subrogation, no, I take that back. If the district court is right on either issue, I'm moot. It doesn't matter. But if by happenstance it was reversed on both issues, then my cross-appeal becomes significant. I don't want to confuse you, and I don't want to extend the argument, but I think there's some question about whether we need to reach a denial of summary judgment at that point. If the case is going back anyway, I think we have some law that says that we don't necessarily. Since you couldn't appeal that in the first place, I don't know that we necessarily reach it. That may be the case, although I know you would review it de novo, and the facts are undisputed. And based upon that, the largest part, by far, of the case is resolved without the necessity for all that time and energy in the lower court. I think that this court would have the power to do so. Very quickly. Scripps' legacy is by far the biggest alleged loss by the FDIC in this case. Approximately $80 million in fines. This goes back to why everything is out of order, as suggested earlier. What happens is, after the bank fails, and there's been this, you already know about the investigation of Diane Lowell about the conflict of interest and not disclosing that she purchased a house from a buyer. Investigation by the RTC takes place. Even at that time, a couple years after the banks failed and after a thorough RTC investigation, the counsel for the RTC concluded that there was no evidence of dishonesty of Diane Lowell related to any loss. It's the Boyd memo. It's part of the record. What he then says, though, is, query, can we piece together a fidelity claim, a fidelity bond claim, based upon this earlier conflict of interest situation with the losses that we're now discovering two years after the banks failed? Losses that are happening then. One of the main scripts. The RTC did not do that piece together. It did not make the claim. It was only until 1997, after the FDIC took over, given the RTC's sunset, and hired new counsel, that the claim was first presented in 1997, piecing together this conflict of interest with the later post-bank failure losses. One of the piece together claims is Scripps Legacy. Now, the bond clearly requires that a loss directly result from the dishonest act of a covered employee. That's the insuring clause. There has to be that relationship, that direct relationship. This court already considered that similar language in bond companies' case, and directly resulting means directly resulting. So, how do you piece together a claim between a conflict of interest and a loss discovered post-failure? You know, I'm a little lost. Let me tell you how I understood this issue so that you can educate me on whether or where I'm misunderstanding it. The way I understood it, the court granted summary judgment against National Union on what amounts to the biggest chunk of money in this case, on the theory that Diane Lowe was a crook. She was involved in the Scripps loans, so the FDIC can recover on National Union's dishonesty bond. And what you're saying is, yes, she was a crook. Yes, she was involved in the loans. But there's no evidence at all she did anything crooked with respect to these loans. That's exactly right. Is that right? That's exactly right. And I think that's where the district court erred in that. I thought it was even a little more discreet than that. She might have done something crooked with respect to these loans, i.e., she misrepresented, perhaps she misrepresented, the net worth of the borrower. But that didn't matter as your ultimate decision. That is also correct, if I may. Given this piecing together after the fact, seven years down the road, the FDIC has to come up with acts to justify claiming that there was a discovery of dishonesty and loss during the policy period related to Scripps. In terms of this dishonesty, all they have is this conflict of interest that happened at the time. The conflict of interest related to a Mr. and Mrs. Lowe buying a piece of property, an emerald ranch, that was a loan related to a borrower different than B and K. Okay? So it has no relation. And also they found that it was fair market value, et cetera. So, in order to find some kind of, because they know it has to have direct result, they come up with these two different financial statements related to B and K. One financial statement is year end, I forget the years now, but 1989, 1990, way back, that financial statement. And they compare it to a financial statement in April of the following year that was a part of the loan submission. First point is, it's apples and oranges. They're different kinds. One doesn't take into account tax liabilities, the other does. Second point, there's no evidence presented, and they had the opportunity to present it, that Diane Lowe prepared the second financial statement. And third point, this is getting to your point, Your Honor, is that it is clear from the undisputed facts that Scripps was approved at the very highest levels of the bank. Before this loan submission even, this loan package was submitted. The evidence is undisputed on that, that Diane Lowe was just being used as a messenger to provide the tapered trail, that the senior loan committee had already approved Scripps' legacy, and it's not even a loan. It's really an investment. The district court characterized it as a critical role, not just a courier. Well, the testimony is undisputed. She was a messenger. It was submitted after the senior loan committee had already approved the loan. That's why I believe that the district court was in error. Now, the senior loan committee approved this before Diane Lowe even saw it? That's right. See, this was, as I say, it was an investment. GAB had a wholly owned subsidiary named GADCO, which is also involved in the Red Hawk situation. But GADCO was a real estate developer company. That's how GAB was making its money in the heydays of the real estate boom in the 80s, in the early 80s. GADCO would take partnership interest in real estate developments that the bank funded. GADCO, well before any submission by Diane Lowe, had gone through the BPI proposal for Scripps' legacy in fine detail. They wrote memos, this is all part of the record, saying this is a risky venture. Some of them didn't want to do it. But given that the return was so potentially great, the senior loan committee did it. Prior to any submission by Diane Lowe, she was a messenger, as Tom Carter, the chairman of the senior loan committee, testified to. Now, what happened was, why this unravels is the regs changed shortly after that, which changed the capitalization requirements of banks that do not allow development arms and their assets to be included in that capitalization. This is not a discovery argument, right? No. No, this is a proximate cause. And that's the final three seconds. Because, in other words, you're assuming discovery. Let's assume discovery. I mean, that doesn't go with my issue. That's correct. It interplays, but it doesn't go. Directly resulting means directly resulting. The alleged dishonest acts of Diane Lowe had to be the direct resulting cause of the Scripps' legacy loan being approved. So your same argument would also go to the fact that she had, I guess she had purchased, she failed to inform of a purchase from BKI, that the senior management had already approved the loan before she. It was all good. She wasn't involved. Isn't it a real problem that there was testimony from some of the loan committees saying if they had known about this conflict, they wouldn't have approved the loan? That may be not a credible story, and the jury could refuse to accredit it, but why isn't that your ultimate problem? That's my ultimate issue that I want to address. And it's because, in Garden, the California Supreme Court case, in first-party coverage, direct, the possible cause has to be the predominant cause. Okay? Directly resulting is the same, in essence, the same thing as in the bond. But here's the point. According to the FDIC's theory of coverage under a fidelity bond, you could have a loan officer padding an expense account. You could have a loan officer taking money out of the petty cash drawer. You could then have a loan that she was involved in, he or she was involved in, go back. And then downstream, in this case about 13 years later, you ask somebody on the loan committee, well, if you had known at the time that she was padding her expense account in California. Why is this just a jury issue? I mean, if somebody says that, that's what you've got. Because of the breadth of this coverage. That would turn this type of bond, a bond that was constructed by both industries jointly, by the banking industry and the insurance industry, into a guaranteed bond of loans. Because any time you could find any totally unrelated acts of dishonesty committed by a loan officer, you're going to get somebody on the senior loan committee to testify later. I would never have done it if I knew. I thought you wanted it to be a jury issue. Summary judgment was rendered against you. No, no. What I want, Your Honor, is for you to do de novo considerate and render a decision here. That's what I. Obviously, there's a second step, I would say. But it still is. No, the district court already found it's a question of fact. You want that reversed. You want to say it's no question of fact. No question of fact in my favor. All right. So how can there be. Are you saying. You have to be saying one of two things. Either we can simply or the district court should have just disbelieved this person. The only other possibility is that you're saying that even if it were so, it isn't a sufficiently proximate cause. Is that what you're saying? I think the latter specifically. And I think even the former. Can you have a situation where, give you my example, a loan officer is found at some point in time, after the bonds, who have done something that could be characterized as dishonest. And one or more loans made by that loan officer, where that loan officer was involved, go back, unrelated totally to taking the money out of the petty cash drawer or having an expense account or buying a house without disclosure. And then you ask the members of the senior loan committee, well, if you'd known of this dishonesty on her part, totally unrelated to the loan, would you ever approve the loan? That's what their argument is, and I don't think it can go that far, as a matter of law. You're saying even if they wouldn't have approved the loan had they known a dishonest employee worked on it, that doesn't show that the loss directly resulted from the dishonesty. I'm saying that. And I'm also saying you can't have somebody speculate 13 years after the fact, based upon unrelated dishonesty, as to what they would have done then. Yeah, I don't think that's mere speculation. I would think many institutions, if they knew that somebody crooked had touched a deal, they'd reexamine it from scratch. And that would mean, of course, that every one of these loans, if they could find any type of dishonesty totally unrelated to the loss, we'd get somebody. I understand. My question was, I don't think you need to establish, if your argument is that the directly resulting language means something, I don't think you have to establish that they're lying when they say we wouldn't have approved the loan. I suppose you're right. Unless there are more questions, Your Honor, I've gone over my time limit, I think. Thank you, counsel. Thank you. May I ask the court to indulge underwriters for just two minutes? Boy, it's been a long time. Yeah. Are you for somebody new? I thought we'd heard from everybody. Well, no, we haven't heard from underwriters, Your Honor. I promise to keep my comments to two minutes. I can be held to that. It's a big enough case. So, okay. And underwriters wrote a very helpful brief. Thank you very much, Your Honor. John Morris, appearing on behalf of Deja Vu, certain underwriters at Lloyd's of London. I'd like to make three simple points. I think I can make them in three simple sentences. First of all, I'd just like to remind the court that underwriters had no involvement whatsoever in the discovery of loss issue, and that, furthermore, its involvement in the subrogation issue only relates to the Redhawk case. Second, I'd like to suggest that, with respect to underwriters at least, this case is exactly like Alt Filish, to the extent that here, the FDIC or its president. Wait a minute. It can't be exactly like. Do you agree with the other parties that here we are interpreting a clause that's actually in the contract and that does use the word prejudice? We're not implying something from the subrogation? You're right, Your Honor. It's discrete in that distinction only. That's pretty important. Well, I don't think it is important. I think the critical part of the case, Your Honor, is wherever the duty of good faith arises, whether implied or by reason of the contract language, the critical point is that, in this case, here the FDIC or its predecessors released the bad guys with prejudice and. . . But not for nothing and not for corrupt reasons as far as one knows. Those are the two differences between this and Alt Filish. Well, I think in this case the evidence is clear, is that the FDIC or its predecessors did absolutely release with prejudice the debtor and irrevocably. . . And not for corrupt reasons. There's no reason particularly to think that they were doing it for any. . . There's no evidence of that. And irrevocably disposed of all of the collateral. And to the extent the Court wants to interpret that and call that a per se rule of prejudice, I believe that's consistent with the Alt Filish case. Is there some excerpt page you can point us to that can show us that had they not done that, the insurance companies could have done better with this collateral? I can't point the Court to a page, but I can reference the Court to evidence which I know is found in the record and which is referenced in our brief. And that is evidence that several years before the sale, the ultimate sale for $10,200, the FDIC or its predecessor, I forget which, declined an offer by another developer, I believe its name was Weyerhaeuser, for between $13 and $15 million. From that, at a minimum, I believe this Court can infer prejudice in the inability of the underwriters to participate in the decision, whether or not to reject that previous offer or not. So what you've got is it was worth between $10 million and $13 million before, and it was worth $50 million after. Unlikely in the extreme, it was only worth $10,000 at the time. Thank you, Your Honor. Is that the answer? Yes, that's exactly right. And the final point I'd like to make, trying to abide by my promise for two minutes, is I'd like to commend to the Court's review the excellent decision in the Alt Filish case, which discusses how subrogation reflects an essential fact of life in the insurance industry. Alt Filish never discussed this prejudice question, just didn't discuss it, because it didn't need to. It was our reason to, and it didn't. But it does discuss the policy reasons which I believe are directly applicable to this case, Your Honor. And again, it talks about the economic fact of life in the insurance industry, whereby... Are you ultimately supporting the district court's position that it doesn't matter whether the insurance company could have done better or not? Yes, I am. It doesn't matter. And the reason it doesn't matter... So with my $40 million hypothetical, you would say, as your colleague did, that even if they had gotten $40 million out of it, you still could walk away from the insurance company? No question, because it would still have denied the insurer the opportunity of participating in the process. And therein lies... It's a process-oriented issue. Yes. So that's what the prejudice is. Is that right under Campbell? I thought it was pretty clear that the California Supreme Court had decided... No, the... ...the insurance company... No, Your Honor. The critical distinction in the Campbell case is that that was a claim advanced by a third party. I think that's a critical distinction in this case. No, the case is cited in Campbell. I haven't looked back at that. I wondered about that. They cite a whole bunch of other cases. Were those also third-party cases? I can't say for certain, Your Honor. What I can say for certain is that there's extensive discussion in the Altsvillage case of other jurisdictions that have followed the Altsvillage rule of not requiring a showing of prejudice, where the rights of subrogation have been absolutely eviscerated prior to the claim. Why does it matter if it's third party? Because there are different interests at stake. The third party had no involvement in the fault in the failure to make prior timely notice. That's the critical distinction. For all of those reasons, Your Honors, respectfully, at least with respect to underwriters, I submit that summary judgment was appropriate and should be affirmed. Thank you very much. Thank you. Thank you, counsel. We went way over time, but we've heard a lot since you talked. Why don't you take a minute or two for rebuttal? Thank you, Your Honor. I'll try and keep this very brief. I'll first address the subrogation issue. One thing is clear. Both of the parties are arguing for a per se rule of prejudice in this case. They're arguing both, as I understand it, now, although not in their briefs. Not in their briefs. And they each responded to your question, Your Honor, that had we recovered $50 million, they still would be – we would forfeit any right to recovery and that they would be off the hook. And I think that it was made clear that the evidence isn't before this Court to make a determination as to the – Well, the evidence is, but the analysis isn't. I don't think – I think the absence of the analysis also goes to the absence of a full explication of the evidence available for the Court to reach – in effect to reach summary judgment on there being an absence of any genuine issue of the fact – of material fact as to prejudice. In the district court, weren't – weren't default issues on the table? They were not. They originally argued it, but they weren't decided, and we certainly haven't provided that analysis. So in terms of the records, there's no reason to think the record isn't whatever it would have been. It's just that we have had no – Yes. No roadmap through the record on a prejudice theory. That is correct, Your Honor. What you heard from both the parties, they would have you draw an inference based on three years later. We'd have you draw an inference based on a public auction. These are inferences that properly should be left to a fact finder. On the discovery issue, I simply have two things to say. In response to your question, Judge Berzon, on whether the dishonesty and the loss have to be connected, Mr. Valeriano pointed to the language about appreciating the significance. And I would just point to page 13 of our brief and pages 120 and 150 through 152 of the record. Mr. Andrews appreciated the dishonesty, appreciated the insider transactions going on with borrowers, and appreciated significant losses involving those borrowers. And we submit that that's sufficient to get to a jury. Additionally, with regard to the issue of there not being any loss, and the loss shows up way down the road later, we would submit that the loss occurs the moment the improper loan is made. And we would be willing to brief the Court on that. Well, when the money goes out, it gets paid back, and you don't lose a nickel. I mean – You're saying that the loan is worth less than it was represented to be. Correct, Your Honor. And that the bond language doesn't require the exact amount of the assets. I work for a bank, and I'm not allowed to loan money to close relatives. And in plain violation of the bank's regulations, and there may even be federal regulations to this effect, I approve a loan to my daughter under a married name so it's not obvious. No question that it's violative. But as long as she pays it back, and I probably wouldn't have done it unless I was pretty confident she would, and I'll probably back her up if she has trouble, the bank doesn't lose a nickel. If no loss occurred, no loss occurred. But if subsequently there's a loss, Your Honor, I believe the case law supports, and we do want to brief that, that the loss occurs at the time of the making of the loan, not at the time that the final amounts are known. But it isn't relevant. No, no, what your cases support is that as soon as you discover the loss, you don't have to discover its full extent. That's very different from saying as soon as you discover that some wrongful conduct took place, you can deem it a loss even though no money has been lost. You're coming back to the original issue, which is most dishonesty bond claims arise out of embezzlements, where the money is taken first and the discovery of the loss comes later. Luckily, Your Honor, here we believe that the loss was discovered by Anders and its significance was known to him sufficiently for a reasonable period of time. Did Anders specifically say he didn't see a connection? Pardon me, Your Honor? Did Anders specifically say he didn't see a connection? I don't think he did say that. I think what he said that they recognized the BKI and Childers loans were bad, and he began writing down loans of both of them, and that the CAATS system identified substantial actual losses. That's the record 144 through 147. Okay. And then finally, I just suggest with all of the discussion of the Scripps legacy loans, that causation in this case is left to the jury and that there is that denial of summary judgment was appropriate with the amount of summary judgment evidence that the FDIC presented as to causation. That's something that should be left for the jury, and the district court properly denied summary judgment. What was the evidence that the loss in the Scripps loan directly resulted from Diane Lowe's dishonesty? Well, it had to be the predominant cause, Your Honor, and the evidence shows, notwithstanding, and again, this is for the jury, but notwithstanding what was said during the argument, that even though a senior loan committee may have decided they wanted to go forward with this, the decision to make the loan and the loan itself was made by the Board of Trustees, and Diane Lowe went in and presented to them, and they testified as to the nature of what they relied on, and it was a very slim package of information provided by Ms. Lowe that undervalued the, excuse me, that overvalued by approximately 50% the amount available for recovery against the two borrowers with whom she had these personal dealings. I think, I mean, one of the things that's said is that really was sort of irrelevant, because they weren't going to, this was all secured by the property, and their personal wealth wasn't enough to pay, even begin to pay back the loan anyway, and what difference did it make? I don't, Your Honor, I don't think that that's what the record reflects, and I think an examination of the evidence that we submitted in our briefs shows that. I don't think $65 million in loans, and they had either $9 million or $14 million, but they certainly didn't have, they were still $50 million short no matter what, so if the property wasn't enough to secure it, they weren't going to make the loan. These people also wouldn't have made the loan if they'd known Ms. Lowe was involved, and involved in the making of the transaction, and involved in the conduct that she was in making personal loans. I'm asking what the relevance is of the, of the, of the, could one say on this record that the, any mistake that might have been made, whether it was innocent or non-innocent with regard to the net worth wasn't going to make a difference? We would submit, Your Honor, that no, the evidence does not. The predominant cause is left to the jury to decide. Thank you. Thank you, counsel.
judges: Kleinfeld, Wardlaw,berzon